[No. 1586.]

## James M. Mason v. The State.

1. PRACTICE—JURY LAW.—The competency of a juror, tested upon his voir dire, is a matter committed largely to the discretion of the trial judge. A juror on his voir dire having qualified himself, he was further questioned by the State's attorney, and said that on the day preceding the trial he had expressed to the defendant the hope or belief that he would be acquitted. Being challenged for cause, he was rejected by the court. Held, that the court did not err.

2. SAME—PRIVILEGE OF COUNSEL.—Objection that counsel for the State abused the privilege of argument comes too late when made for the first time after the conclusion of the trial, and under such circumstances will not be revised by this court, unless it clearly appears that the defendant suffered injury therefrom.

3. SAME—CHARGE OF THE COURT—EVIDENCE.—In the absence of exceptions to the charge of the trial court, and of requested instructions, the charge will not be revised except in the case of fundamental error. See the opinion for objections urged to the charge in the motion for new trial, and held untenable in view of the evidence; and see the statement of the case for evidence held sufficient to sustain a conviction for murder in the second degree.

APPEAL from the District Court of Llano. Tried below before the Hon. J. C. Townes.

The conviction was for the murder of J. E. Edwards, in Llano county, on July 14, 1882. A term of five years in the penitentiary was the punishment inflicted by the jury.

Tom Williams, the first witness for the State, testified in substance that the deceased passed the night of July 13, 1882, with him, at his house, about three miles from the residence of H. J. Reynolds, in Llano county. On the next morning the witness and the deceased started to Tally's store, across the river. Just as they started, witness proposed to go by Reynolds's house, that he might post a horse, Reynolds being a county commissioner. Deceased agreed, and the two went to Reynolds's house, which stood in a field forming one side of a lane. When they reached a point in front of the house the two dismounted, and witness hitched his horse and went in. At that time he did not see the defendant. The deceased dismounted, put one hand over his

horse's neck, near the shoulder, and threw his other over the saddle until his hand nearly touched his Winchester gun, which was then suspended in a scabbard. This position placed the horse of the deceased between him and the house, with the gun on the side of the horse next to the house. In this position, the witness left the deceased as he went to the house. As he approached the house, the defendant walked out to the gallery with a rifle in his hand. Witness spoke to him, "howdy, Jim," or, "howdy, Mason." Defendant replied: "Don't speak to me." Witness asked: "Why?" He replied: "You have come to raise a row, and I don't want any man to speak to me who has come for a row." Witness replied: "I have not come for that purpose, but to see Mr. Reynolds, to post a horse," and inquired where Reynolds was. Defendant then said: "It is all right, then; Reynolds is down in the field." While on the gallery, witness saw Mrs. Reynolds and Mrs. Edgar Edwards (wife of the deceased, and a daughter of Mrs. Reynolds), in the house.

Witness then started off to find Reynolds, and looked back and saw defendant and deceased facing each other, defendant still on the gallery, and deceased in his original position, seventy-five yards from the house. Defendant spoke to the deceased, saying, as witness understood him: "Do you want some of it?" Deceased replied: "Yes, I do." Defendant ran from the gallery to a tree near the fence, a distance of from ten to twenty yards, and the firing began. Witness could not say who fired the first shot, but, to the best of his knowledge and belief, defendant fired twice before the deceased fired at all. Witness could not say that deceased fired at all before he fell. It was the opinion of the witness that the deceased was squatting down when the defendant fired the first shot. He was standing when defendant stepped off the gallery. After two shots by each had been fired, the deceased called to the defendant: "Hold up, Jim; you have killed me already." Defendant stopped firing, and turned and started towards the house, when the deceased fired at him. Defendant then turned, the firing recommenced, and four more shots were fired. Witness carried the deceased to a shade tree near by when the shooting stopped, examined his wounds, and found him shot through the left hip, the left leg broken; and he was also wounded in the right leg.

After witness got the deceased to the shade tree, he asked for water, which the defendant brought to the fence where witness got it. Witness went to the house for a pillow and quilt. Witness

felt positive that the deceased fired no shot while standing. His horse was wounded in the left hind leg, on the inside muscle, just above the hock. The stirrup, next to the horse, was shivered by a ball. Witness went to Mexico just after this shooting. He had been asked what his testimony would be in this case. The deceased had his gun in the scabbard when he and witness rode up to the house, and witness did not know at what stage of the proceedings he drew it out. It was his belief that the gun was in the scabbard when defendant asked him if he "wanted any of it," at which time defendant had his gun in his hand. Defendant shot off-hand, and deceased squatted, to shoot under his horse. Deceased did not go up to the house, nor enter the enclosure. He said that he had been forbidden to do so by Reynolds. His wife, the daughter of Mrs. Reynolds, was separated from him, and living at Reynolds's at the time.

This witness was subjected to a severe cross-examination. He could not say that, when he addressed the defendant on the gallery, the latter did or did not say: "I will not speak to any man who followed me home after dark." Witness's back was turned towards deceased at this time, and he could not see what, if anything, deceased was doing. Witness thought he had mounted his horse, preparatory to starting off to see Reynolds, when the defendant addressed the deceased in the words stated. He could not remember that deceased made any reply to him when he called him to come on; nor was he positive as to who fired the first shot. Deceased fired the first shot after he called upon the defendant to cease firing. Witness could not tell whether he asked for water and defendant brought it, or whether the defendant brought the water of his own volition. He could not say positively that deceased fired, or did not fire, before he squatted down, but did not think that he did. Witness was now testifying only to the best of his recollection of the affair. He was young at the time, frightened, and was witnessing a shooting affray for the first time. Besides, he was riding a young, unbroken horse, which was pitching and dividing his attention. He was now unable to say whether or not he and deceased went by Duval's and Trulove's that day to procure cartridges. It is quite probable that they did. After eight shots had been fired, the deceased again called to defendant to "hold up," and witness called to defendant to desist. Defendant replied that he would if witness would get deceased's gun and give it to him. Witness replied that deceased's gun was empty,

and defendant said: "Bring it any way." Witness did so. Defendant quit shooting as soon as witness requested him to stop. Defendant lived at Reynolds's house. Deceased and witness were related by marriage.

Witness was at church on the night before the shooting, and met the deceased there. The defendant, Reynolds, Mrs. Alice Edwards, the wife of deceased, and her sister were there. When church broke up, the party named started home together. Witness invited the deceased to go home and spend the night with him. They started together to witness's house. After going some distance the deceased galloped on ahead of witness in the direction of Reynolds's, and in a short time returned to witness, and went home and spent the night with him. Witness was not following the defendant or the Reynolds party that night.

J. T. Nicholson was the next witness for the State. He testified, in substance, that he went to the deceased about two o'clock on the day of the shooting. He found the deceased lying on a pallet under a tree, about seventy yards from the house of H. J. Reynolds. Mr. Sandals, since deceased, was the only person with him. He was shot in three places. One shot entered rather back of the left hip. Another entered the left thigh, ranged upward, and penetrated the abdomen. Either of these wounds was necessarily fatal. Another, though not in itself a mortal shot, entered the right leg below the knee and ranged upward. Witness took the deceased home in a hack, and was with him up to his death, which occurred a few days afterward. Just before his death, but while conscious and sane, and of his own volition, without being interrogated, the deceased made the following declaration:

"On the night before I was shot I was at church. I there saw Jim Mason, Mr. H. J. Reynolds and his daughter, and my wife Alice. I love Alice. After she, Reynolds, daughter and Mason left the church, I rode up behind in the road and overtook Reynolds and a lady. I said: 'Is that you, Reynolds?' He replied: 'Yes.' I then asked: 'Is that Alice with you?' He replied: 'Yes.' I then said: 'That's all right,' and rode back. I staid at Mr. Williams's that night. Next morning Tom Williams and I started to go across the river to Tally's store. Williams proposed to go by Reynolds's to post a horse, and we went by for that purpose. When we got opposite the house in a lane we got down from our horses. Williams hitched his horse and went into the house. I threw the reins of my bridle down from my

horse's head, and leaned on my saddle on the side of my horse opposite from the house. Mason came out from the house on the gallery with a gun in his hand. We stood and looked at each other. Mason said: 'Do you want any of it ?' I replied: 'Yes, I do.' Mason came off of the gallery and fired first, and struck me in the left hip, and I fell. Mason fired again, and then I fired. We fired four shots each during the difficulty."

On his death bed, and about the time of these declarations, the deceased professed religion and was baptised by Parson Crownover. Deceased then said that he was going to die, and requested his father not to trouble the defendant for shooting him, because his father had a family and had better not. Witness did not remember that, at this time, he said anything about the defendant and his wife Alice. Witness was with him from the time that he first began speaking until he died. Deceased could not have stood after receiving either of the wounds in the left leg. The position of the deceased at the time of the shooting, as shown to the witness, was in the lane, forty or forty-five yards from the house; that of the defendant was some thirty or forty feet from the house, just inside the fence. Neither Mrs. Edwards nor her mother came near the deceased at any time after he was shot.

Cross-examined, the witness stated that he and the deceased were brothers-in-law. Deceased did not state on his death bed that he did not blame the defendant; that he would have killed the defendant if he could. Witness heard his entire statement. Lockwood and Stegall, and, the witness believed, Allsup and Price were present.

Parson Crownover, for the State, testified that he was a minister of the Gospel of the Methodist Episcopal Church, South, and was present when the deceased died. Two or three hours before he died, the deceased professed religion. Witness named the subject to him, and he said that he was ashamed to meet God after having spent his life in sin. He said that he could not live. Proceeding to state the dying declarations of the deceased, the witness detailed them as the witness Nicholson had done, from the occurrences on the night before the difficulty to the time that defendant spoke to deceased from the gallery. Continuing, the witness stated that, in his declarations, the deceased said that, just after defendant stepped off the gallery, he, defendant, fired the first shot, which took effect in the left hip, and he fell; that defendant then stepped to the tree and

fired again, when he, deceased, called to him: "Stop, Jim; you have killed me already;" that the defendant thereupon ceased firing, and that he, deceased, fired upon the defendant, and they kept up the firing until they had exchanged four shots each. It was the recollection of the witness that, in these declarations, the deceased said that he started to draw his gun from the scabbard after defendant stepped off the gallery, and did not have it entirely out when the first shot was fired. On this point, however, witness was not positive. After deceased professed religion he requested his father not to trouble the defendant.

On his cross-examination, the witness repeated, in substance, his testimony in chief, emphasizing his understanding of the deceased, that the defendant fired the first shot as he stepped off the gallery. He did not, in the hearing of the witness, say that defendant stopped when he asked him to do so, or that he did not blame the defendant, and that he would have killed him if he could. Witness stepped out of the room once for a minute or two, and it was during that interval that he made such statement, if he made it at all. He did not give that as a reason for his request to his father not to trouble the defendant. Witness had been talking to him about religion and the necessity of forgiving before he could be forgiven. He dozed off, and when he awakened, with the light of religion in his eyes, he turned to his father and said: "Father, I have two sisters, and love them as well as a man ought to love his sisters. But they are married, and their husbands can support them. I want you to have all my property, and I have one last request to make of you—don't bother Jim Mason." The State rested.

Joseph Allsup was the first witness for the defense. He detailed the dying declarations of the deceased as did the witness Nicholson, except that, according to this witness, the deceased, in his declarations, said that he and defendant had fired two shots each when he, deceased, called on defendant to stop shooting; that defendant did stop, turned to go to the house, when he fired on the defendant, and then each fired twice, making eight shots in all. He stated also that deceased requested his father not to trouble defendant, for that he, deceased, would have killed defendant if he could.

William Lockwood, for the defense, detailed the dying declarations of the deceased as they were detailed by Nicholson, except that, in speaking of the occurrences at the church on the

night before the shooting, the deceased said that he thought his wife left the church with the defendant. Deceased further stated in his declarations that, after the first four shots were fired, of which the defendant fired the first, he requested defendant to desist, which he did, and turned toward the house, when he, deceased, raised himself from the ground and fired at defendant. The testimony of the next witness, Stegall, was substantially the same as that of this witness.

Price's testimony, for the defense, was substantially the same as that of Stegall and Lockwood, with the addition that, in his declarations, the deceased said that, when defendant came out on the gallery with his gun, he, deceased, was standing by his horse with one arm across the saddle, and that with that hand he took hold of his Winchester and worked it up and down in the scabbard a time or two, and that defendant then asked him if he wanted any of it, and he answered, "yes, by G—d, I do."

A. G. Mostiet testified, for the defense, that in May, 1882, the deceased came to Duncan's where witness was at work, and called the witness to the fence to discuss a fight between McAllister and Trussel, which had occurred a few days before, and of which the defendant was a witness. In that conversation deceased said that he wished that Trussel had cut the defendant's throat. Deceased said: "By G—d, Jim Mason is taking too much dish around here; both of us cannot live in this county." Witness reported this conversation to defendant about two months before the shooting.

J. D. King testified, for the defense, that, two or three days before the killing, the deceased came to the residence of the witness's mother. His wife, Mrs. Alice Edwards, was there, standing in the door. Deceased spoke to her, but she declined to speak to him. Witness and deceased then went to the horse lot, where, during a conversation, deceased said: "Mason is taking too much dish around here, and he had better look out."

Willie Reynolds was the next witness for the defense. He testified that between ten and eleven o'clock on the day of the shooting, he saw the deceased and Tom Williams coming horseback up the path through the lane toward his father's house. When they got within fifty or sixty yards of the house they dismounted. The witness went into the room where the defendant was lying on a bed, and told him that "those fellows were out there." Defendant asked, "what fellows?" Witness replied: "Edwards and Tom Williams." Defendant got up and walked

---

---

out to the gallery. He saw Tom Williams coming toward the house, and stepped back into the house and got his Winchester, and returned to the gallery. Tom Williams spoke to him, and the witness ran through the house, down into the field, to tell his father that deceased and Williams were at the house. Before witness reached his father the firing commenced, and it was over before he got back to the house with his father.

The substance of the testimony of H. J. Reynolds, for the defense, was that in September or October, 1881, between the hours of eleven and twelve o'clock at night, the deceased came to his house, stepped upon the gallery, calling for the witness and started into the house. Witness got up from bed and asked him what he wanted. He said that he wanted his wife Alice. Witness replied that if she was willing to go with him, he had no objection, but that he could not get her if she did not want to go. Alice, the wife of the deceased, was witness's step-daughter. She had separated from deceased some time previous to that. The deceased grew angry and cursed and abused witness, and bantered the witness to go out of the house and fight. The defendant, who was staying at witness's, came out of his room, and told the deceased that witness was too old to fight, but that he would fight deceased, if it was a fight he wanted. Deceased then asked witness to go to the gate and have a friendly talk. The defendant and witness walked out to the gate with deceased, and after a few minutes talk the deceased said: "I have nothing against you, Reynolds, but you, Jim Mason, had better look out." Witness then told the deceased not to come on his place again.

On the night of July 13, 1882, witness went to church with Alice, the deceased's wife, who was then staying with him, and defendant went with the witness's younger daughter. The deceased was at church. When witness and party went to get their horses to go home, deceased went to his wife, and had some conversation which the witness did not hear. When Alice and witness got ready, and started on their return, he observed that the defendant and his, witness's, younger daughter had proceeded on their way home some hundred or two yards. When witness and Alice had accomplished, perhaps, a half mile, witness heard the rapid approach of two horses. He looked around and saw the deceased and a man whom he took to be Tom Williams. The man who was with deceased checked up his horse a short distance from witness, and deceased rode up.

He asked: "Is that you, Reynolds? Where's Alice? Is that her with you?" Witness, replied: "Yes, she is with me." Deceased replied: "Then, by G—d, it is all right," and turned his horse, and he and his companion rode off, rapidly, in the direction from whence they came. This occurred between the church and witness's house. Witness and Alice soon overtook defendant, and told him of the occurrence, the witness adding, speaking to defendant, "I suppose you know what that meant?" Defendant replied: "I guess I do."

Next morning, while in his field, some four or five hundred yards from the house, the witness heard four shots in rapid succession. Two were so near together that they were scarcely distinguishable. After a very slight intermission, the two more shots followed. The witness started to his house. A longer intermission was followed by four other shots. When within two hundred yards of the house, the witness met his son Willie coming towards him. The firing had ceased before the witness reached the house. Reaching there, and ascertaining what had happened, the witness went to the fence, where he met Tom Williams, whom he asked if deceased did not need some water. Witness then returned to the house, secured a bucket of water, some bedding and a pillow, and returned to Williams. He then told Williams to ask deceased if he wanted to see him, witness, or would permit witness to go to him. Williams returned, and said that deceased wanted to see the witness. Witness then went down and had a conversation with deceased. He told deceased that he was sorry to see him in that condition. Deceased replied: "I brought it on myself, by my foolishness. I have always been a fool. I do not blame Jim Mason. I would have killed him if I could." Witness sent Tom Williams to notify deceased's father. Nicholson took deceased home in a hack. ·

Cross-examined, the witness stated that he had no recollection of having said that he was glad of the death of the deceased. It was quite probable, in view of the trouble the deceased gave him, that he might have said so. Defendant had never, before or after the death of the deceased, paid attention to Alice Edwards, other than as a member of the family. He had never waited upon her previous to her marriage with the deceased. He had never escorted her into society or away from home at any time or upon any occasion. Defendant was not armed on the night in September or October, 1881, when deceased came to the house, and when the defendant and witness went with de-

ceased to the gate. Defendant made no reply to deceased when the latter told him to look out. Witness had never heard defendant utter a threat against the deceased.

Mrs. O. O. Reynolds testified, for the defense, that she and her daughter Alice, the wife of deceased, were in the house on the morning of July 14, 1882, when deceased and Tom Williams rode up to the gate and dismounted. Deceased stood on the side of his horse opposite the house, with his left hand resting on his horse's neck, and his right thrown across his saddle. Williams, after dismounting, walked towards the house, and witness started to the gallery. When Williams got near the gallery the defendant came out of a room, walked into a small side room, and then came to the edge of the gallery, with his Winchester gun in his left hand, the muzzle pointing down. Williams said: "Good morning, Jim." Defendant replied: "Don't speak to me. I don't care to speak to a man who followed me from church. You have come to raise a row with me this morning." Witness replied that he had not, and defendant replied that it was then all right. Williams returned, mounted his horse and started off. He called to the deceased to go with him, which the deceased did not do.

While standing on the gallery, and about this time, the witness saw the deceased, with his right hand, raise his gun a little and drop it back into the scabbard. He repeated this two or three times. He then took hold of the gun and pulled it nearly out of the scabbard. Defendant then stepped off the gallery five or six steps, telling witness to get out of the way. He then called to deceased and asked him if he wanted anything, and deceased answered: "Yes, by G—d, I do." Witness had regained her room by this time, and peeping through a hole, she saw the deceased bringing his gun to a shooting position, pointing in the direction of the defendant. At this moment, two shots were fired so closely together that witness could scarcely distinguish them apart. Two more shots were then fired, and deceased called to defendant to shoot no more; that he was already killed. Defendant stopped shooting and turned around. The deceased, who had dropped to the ground, after defendant had walked five or six steps towards the house, raised and fired again. Defendant turned and fired two more shots at deceased. Four shots were fired at this time, making eight in all. Deceased called again, and Williams called out: "Jim, hold up, you have shot him all to pieces already, and his gun is empty."

Defendant stopped and told Williams to bring him deceased's gun. Williams replied: "No use in that; it is empty, and he is out of cartridges." Defendant told him to bring it anyhow, which Williams did.

Neither the witness nor her daughter Alice went out to deceased after he was shot. Witness had never said that she rejoiced at the death of the deceased, and had never heard any one else say so. She had never heard the defendant make any threats against the deceased.

The motion for a new trial included the grounds involved in the opinion.

*Matthews, Wilkes & Wood,* for the appellant: The court erred in its charge to the jury upon the law of manslaughter. In addition to the failure to define adequate cause, we call attention to the fact that, by the charge of the court, the killing was only reduced to manslaughter where it was the "immediate result of a sudden passion, then and there existing in the mind of the defendant, aroused by a provocation *then and there* given," etc.

By our statute, manslaughter is voluntary homicide committed under the immediate influence of sudden passion from an adequate cause, but neither justified nor excused by law, but the charge of the court treats provocation and adequate cause as synonomous.

The provocation under the statute must be given at the time of the killing, but an adequate cause may arise partly from antecedent matters.

An act done or slight provocation given at the time of killing might not be deemed adequate cause, but these, though in themselves unimportant, might, when coupled with the character, former acts and threats of deceased, produce a degree of anger or terror sufficient to render the mind incapable of cool reflection. The adequate cause would then consist of the antecedent matters and the act done or provocation given at the time of the killing.

In judging whether or not a killing was in self-defense, we take into consideration not only whether there was a necessity for the killing, but also whether or not the defendant believed there was such necessity, and in order to ascertain whether there was a foundation for such belief, we take into consideration not only the acts of deceased, at the time of the killing, but also the communicated threats and acts and the character of the

deceased. If these are inquired into, to ascertain whether or not there existed in defendant's mind a belief of any fact, then might they not as well be inquired into to ascertain whether or not a certain degree of rage or terror existed in defendant's mind? (*Neyland* v. *The State*, 13 Texas Ct. App., 549; *Jennings* v. *The State*, 7 Texas Ct. App., 358; *Bohanon* v. *The Commonwealth*, 8 Bush., 481, 8 Am., 474.)

The court erred in its charge upon the law of self-defense.

The only attempted application of the law of self-defense to the facts of the case was in the fourteenth and fifteenth paragraphs of the charge, which are as follows:

Paragraph 14. "If you believe, from the facts in the case, that the defendant resided at the home of H. J. Reynolds, and further believe that the deceased came to the said premises for the purpose of doing serious bodily harm to the defendant or killing him, or that from the facts and circumstances transpiring there as they reasonably appeared to the defendant at the time it reasonably appeared to the defendant that such was his purpose and intent, and that the said Edwards did some act which showed a present intention to so kill or injure the defendant, then such killing, unless the necessity was brought about by some wrongful act on the part of the defendant, done then and there, would be in necessary self-defense and you should acquit him."

Paragraph 15. "If you believe from the testimony that the said Edwards came to the premises of H. J. Reynolds, and that the same was the home of defendant, but believe that the purpose and intent of said Edwards was not to provoke a difficulty with and do serious bodily harm to or kill the defendant, but that his purpose and business there was lawful, and further believe that the defendant, without malice as that term is defined to you herein, reasonably believed from the facts and circumstances as they reasonably appeared to him that it was necessary then and there to defend himself from death or serious bodily harm, and the said Edwards's conduct was then and there of such character as to make it reasonably appear therefrom that it was his intention then and there to kill or do serious bodily harm to the defendant, then the killing of the said Edwards by the defendant, if you find any such killing, would be, in law, in necessary self-defense, and you should acquit the defendant, unless such necessity or reasonable appearance of necessity was brought about by the wrongful act of the defendant

there at the time." These charges are erroneous because the defendant may have provoked the combat wrongfully but without felonious intent, and in that event the final killing in self-defense would not have been murder. (*Perry* v. *The State*, 44 Texas, 477; *Reed* v. *The State*, 11 Texas Ct. App., 515; *Green* v. *The State*, 12 Texas Ct. App., 444; *King* v. *The State*, 13 Texas Ct. App., 282.)

. The fourteenth paragraph is especially bad because it is one of only two charges upon the theory of self-defense, as set up by defendant, and virtually says that if certain facts were established, the killing of defendant by Edwards would be justifiable.

The fourteenth paragraph is erroneous also, because it tells the, jury that if deceased went to where defendant lived for. the purpose of killing defendant, and did some act which showed a present intention to kill him, then for the killing of the deceased by defendant to have been justifiable, it must further appear that the necessity for the killing was not brought about by any wrongful act of defendant. We submit that if deceased went to defendant's house for the purpose of killing him, and did some act which showed a present intention to kill him, then the defendant had a right to kill deceased, regardless of any wrongful acts that might have been done before that time by defendant; and the jury should have been so instructed, and not been left to search through all the evidence for some wrongful act of defendant which would take away his right of self-defense when confronted by his enemy, who has come to his home to kill him, and is proceeding to carry out his intention.

The fifteenth paragraph is erroneous because the jury are by it told that, before the killing would be justifiable, it must appear that the defendant, without malice, believed that it was necessary to defend himself from death or serious bodily harm. We submit, that no matter whether or not the defendant entertained malice or hatred towards the deceased, if the circumstances existed which authorized him to take the life of deceased, or if they reasonably appeared to him to exist, he was permitted to exercise his right of self-defense, without regard to the state of his feelings towards the deceased.

There being evidence tending to show that even if defendant provoked the difficulty, he afterwards, in good faith, withdrew from the combat before the fatal shot was fired, and abandoned all hostile intent, and that after such withdrawal the deceased

renewed the contest and was killed, the court erred in not charging the jury on the law applicable to such facts.

The evidence of the witnesses is conflicting, and it is impossible to determine with certainty who commenced the difficulty.

Taking into consideration the former threats and acts of deceased as testified to by the witnesses, and the testimony of defendant's witnesses, the killing was unquestionably in self-defense. But suppose it is shown that the combat in which the killing took place was provoked by some wrongful act of the defendant, still it appears that, before the fatal shot was fired, the defendant, when asked by deceased, quit firing and turned to go toward the house, when he was fired on again by deceased and returned the fire. The testimony of Mrs. Reynolds, Mr. Reynolds, Willie Reynolds, and even the testimony of Williams and the dying declarations of the deceased, show a considerable lapse of time between the first four and the last four shots; and it is evident that, after the first firing, the defendant, in good faith, retired from the combat, and only renewed it when compelled to do so in self-defense, and the killing, having taken place in this second combat, was justifiable. (1 Bish. Criminal Law, secs. 870 and 871.) In the case of *Stoffer* v. *The State*, 15 Ohio State Reports, 48, cited in a note to the sections of Bishop's Criminal Law above referred to, it is expressly held that where one makes a malicious assault upon another with intent to kill, and afterward in good faith withdraws from the combat, his right of self-defense is restored, and, if pursued by his antagonist, he is justified in slaying his antagonist to save his own life. And in the case of *Cook* v. *The State*, also decided by the Ohio court, the same question was again decided the same way, with the addition that the right of self-defense was restored if the original assailant endeavored to withdraw from the combat. (This case we do not find reported in any of the reports, but it will be found cited in Walker and Bates's Ohio Dig., Vol. 2, p. 1140, as reported in 3 Weekly Law Mag., pp. 344 and 407). In the case of *Hitlner* v. *The State*, 19 Indiana, 48, it was held that even if the defendant was the aggressor and made the first attack, and afterward withdrew from the contest or retreated, and, being pursued by the deceased, slew him, the court erred in charging the jury he would be guilty of manslaughter at any rate.

In the opinion in the case of *People* v. *Shorter*, 4 Barbour, 483, the court says: "If death happen in the course of a mutual

combat, voluntarily continued, it will be at least manslaughter. In such a case a person, to justify the killing of his adversary, must show that he had declined further combat, or endeavored to adopt some other means of security short of taking his adversary's life, or that his situation or the fierceness of the fight would not permit him safely to do so."

In *People* v. *Sullivan*, 7 New York Reports, 396, the main facts were that Smith and Sullivan had a fight with weapons up stairs in a boarding house. Smith, freeing himself from the difficulty (Sullivan appearing to be aggressor), went to the foot of the stairs and returned at once; Sullivan in the meantime remaining standing at the head of the stairs. When Smith reached the head of the stairs he was stabbed and killed by Sullivan. It was held that if Smith returned up stairs to renew the fight, and Sullivan had reasonable ground to believe that Smith designed to do him some great personal injury, and that there was imminent danger of such design being accomplished, then the killing was not murder.

In the case of *Kemp* v. *The State*, 13 Texas Court of Appeals, 566, a charge which stated the law of killing in self-defense after withdrawal from combat, as decided by the courts of New York, Ohio and Indiana in the cases above referred to, was held to be correct.

There was, as above shown, evidence strongly tending to show that defendant killed the deceased in self-defense after he (defendant) had withdrawn from the combat, and the court should have charged the law applicable to this theory of the defense. (*Ainsworth* v. *The State*, 11 Texas Ct. App., 339; *McLaughlin* v. *The State*, 10 Texas Ct. App., 340; *Johnson* v. *The State*, 43 Texas, 612.)

J. H. Burts, Assistant Attorney General, for the State.

WILLSON, JUDGE. 1 It is shown by a bill of exceptions that one Forehand was offered as a juror in the case, and, after answering the statutory questions in a manner showing him to be a qualified juror, he was further questioned by the State's counsel, and stated that on the previous day he had met the defendant and had a conversation with him, in which conversation he had told the defendant, speaking with reference to this case, that he *hoped*, or he *believed* (he did not remember which word he had used), that he, defendant, would come out all right. Thereupon

the State challenged the juror for cause, and the court sustained the challenge and stood the juror aside.

We cannot say that in this action of the court there was any error. It was the duty of the court to see that a jury was impanelled, composed of men who were free from all bias for or prejudice against the defendant; who were impartial towards either the State or the defendant. In determining as to the fitness of a juror, the question is largely one of discretion with the trial judge. He has the proposed juror before him; observes his manner of answering questions, his appearance and many other indications which cannot be brought before this court; and hence the trial judge is in a much better condition to pass upon the fitness of the individual to serve as a juror in the case, than this court can be from the record alone. Such being the case, this court will not revise such action of the trial judge unless it should be made apparent to us that the trial judge had abused the discretion confided to him, to the injury of the defendant's rights, or that he had infringed the law. (*Ray* v. *The State*, 4 Texas Ct. App., 450; *Gardenhire* v. *The State*, 6 Texas Ct. App., 147; *Wade* v. *The State*, 12 Texas Ct. App., 358.)

It is by no means apparent to our minds in this case that the proposed juror was not subject to the challenge for cause made by the State. He had conversed with the defendant about the case, and had expressed to him a *hope* or a *belief* that he would come out all right. While this alone might not be sufficient to disqualify a juror, yet, in connection with other matters appearing before the trial judge, he might be fully satisfied that the individual was not impartial, and not a fit juror for the case. Thus, in this instance, the proposed juror, when first asked if he had any conversation with anyone about the case, stated that he did not remember any such conversation, and it was not until the time and place and party with whom he had such conversation had been called to his attention, that he admitted the same. This apparent unwillingness to mention his interview with the defendant was, to say the least of it, suspicious, and perhaps satisfied the court that the juror was not impartial.

2. Complaint is made that counsel for the prosecution, in their argument to the jury, went out of the record and made statements and arguments which were not authorized by the evidence, and which were calculated to prejudice the rights of the defendant. No exceptions were taken at the time to the alleged objectionable course of counsel for the prosecution, and it

was not until after the conclusion of the trial that the attention of the court was called thereto. While the course of argument pursued by the counsel for the prosecution, in some respects, was not such as perhaps would harmonize with the spirit of the rules governing arguments, and therefore not such as should be commended, still we have not been impressed in this instance with the view of counsel for defendant, that there was anything in the remarks or manner of counsel for the prosecution that was materially objectionable, or that was calculated to injure the rights of the defendant. No exceptions to the arguments having been made by the defendant at the time, it is too late afterwards to make objection, unless it be made clearly to appear that he has suffered injury therefrom to his rights. It does not so appear in this case.

3. Several objections are made by the defendant to the charge of the court. No exceptions were made to the charge of the court on the trial, nor were any special charges requested by the defendant. Objections to the charge are for the first time presented and urged in the defendant's motion for a new trial. We have given the charge a careful examination, and in our opinion, when taken and construed as a whole, it is a full, fair and correct exposition and application of the law of the case. That it did not define "adequate cause," in instructing upon the law of manslaughter, would be an objection which under some circumstances would be a valid one, if excepted to in time, or in some cases perhaps without any exceptions being taken. But in this case, we find no such state of facts as imperatively demanded a specific explanation of "adequate cause." There is no evidence of "adequate cause" to which such an explanation could be fairly and reasonably applied. There are some portions of the charge relating to manslaughter which are perhaps not strictly correct, but, in view of the evidence in the case, we are of the opinion that there is no such material error in this portion of the charge as was in the remotest degree calculated to injure the rights of the defendant.

Upon the question of self-defense we think the charge was full, correct, and as favorable to the defendant as the evidence would warrant. It is objected to the charge, that the court failed to charge the law in relation to the withdrawal from a combat in good faith, by a party who has been engaged therein, and the right of self-defense after such withdrawal. In a proper case, there is no question but that such instructions should be

given. In the case at bar, however, we do not consider that the defendant's rights could have been injured by the failure of the judge to give such a charge. We do not think that the evidence demanded it. It is quite clear to our minds, from the evidence, that the mortal wound had been inflicted upon deceased by defendant *before* the defendant withdrew, or attempted to withdraw from the conflict.

In the absence of any exceptions to the charge, or of any refused special charges, we are clearly of the opinion that there is no such fundamental or material error in the charge of the court as would warrant us in setting aside the judgment.

We thing the court did not err in overruling the defendant's motion for a new trial. There is ample evidence in the record to support the verdict of the jury, and the newly discovered evidence set forth in the motion is not of that character which, on another trial, would be likely to change the result. We cannot perceive how such evidence could affect the issue in the case one way or the other, unless the facts stated had been communicated to the defendant prior to the homicide, and it is not pretended that such was the case.

Believing that the defendant has been fairly tried and legally convicted, the judgment is affirmed.

*Affirmed.*